## LIFE INS. CLEARING CO. v. BULLOCK.

(Circuit Court of Appeals, Fifth Circuit. December 20, 1898.)

### No. 695.

1. **LIFE INSURANCE—WAIVER OF DEFENSE TO POLICY—QUESTION FOR JURY.**

In an action on a life insurance policy, although a good defense is shown, where it appears that the defendant received information during the lifetime of the insured from which it knew, or should have known, of the existence of such defense, and afterwards called on the insured for a premium, which was paid, the question of whether defendant thereby waived such defense requires the submission of the case to the jury.

2. **SAME—CONCEALMENT IN APPLICATION.**

The failure of an applicant for life insurance to disclose diseases from which he has suffered, in reply to pertinent questions, is not rendered immaterial by the fact that they resulted from habits or other diseases which he did disclose.

In Error to the Circuit Court of the United States for the Northern District of Alabama.

The Penn Mutual Life Insurance Company having rejected the application of E. C. Bullock for insurance on his life, the Life Insurance Clearing Company, with knowledge of the rejection, accepted the risk, and issued a policy to Bullock, dated February 13, 1894. Bullock died on October 19, 1896. Eva M. Bullock, his widow, being the beneficiary of the policy, brought suit upon it in the circuit court of Jefferson county, Ala., against the Life Insurance Clearing Company. The plaintiff in error removed the suit to the United States circuit court at Birmingham, Ala. The case was tried in the latter court, and judgment was rendered against the insurance company, which has brought the cause to this court by writ of error. The gravamen of the defenses set up by the insurance company is that Bullock, the decedent, concealed that he had been insane, and an inmate of an insane asylum, on several occasions, and had there been treated for insanity; that, being questioned as to the diseases he had had, he failed to give full and truthful answers; and that he stated that within five years he had consulted or been prescribed for by but one physician, whereas, in truth, he had been prescribed for by other physicians. The assignment of errors address themselves to the exclusion or admission of testimony; to one charge alleged to have been improperly given; and to several charges alleged to have been improperly refused.

M. D. Munn, Wm. C. Ward, and W. R. Houghton, for plaintiff in error.

A. H. Merrill and Z. T. Rudolf, for defendant in error.

Before PARDEE, Circuit Judge, and SWAYNE and PARLANGE, District Judges.

PARLANGE, District Judge (after stating the facts as above). The defendant below requested the trial court, in different forms, to direct a verdict in its favor. In our opinion, those charges were properly refused. Even if it were conceded that Bullock, the decedent, made the concealments of fact charged by the defendant below in its pleadings, it would not follow that a verdict should have been directed in favor of the defendant.

The evidence, which has been brought up as part of the bill of exceptions, shows that on October 7, 1895, the insurance company received from some one a confidential statement to the effect that

Bullock "was then under treatment in the insane hospital for alcoholism; that he drank to excess, which affected his mind; that he was then for the third time in that hospital." Bullock, prior to the issuance of the policy, replied, in answer to the question whether he had had insanity or other specified diseases, "None, except hallucinations from drink;" and in a letter of date February 17, 1894, which he wrote to the insurance company before they delivered the policy, he stated that he had a long and stubborn spell of malarial fever in the fall of 1892, affecting to some extent his mental as well as his physical faculties, and that, under the advice of his physician, he went to the State Hospital at Tuscaloosa, Ala. In the letter Bullock further stated as follows: "Referring to the mental trouble, it has no form of insanity except that growing out of my malarial trouble and the weight of neglected business, which, with an increasing family, demanded all my time and efforts." There is evidence in the record showing that the hospital in which Bullock was treated was known as the "State Hospital at Tuscaloosa, Alabama," as well as the "Insane Asylum" and other appellations. The evidence does not show on what day the insurance company took the first step towards ascertaining the facts. The actuary of the company testified that after receipt of the confidential information on October 7, 1895, the company wrote to the asylum, but kept no copy of the letter. The date of this letter is not stated, but a letter which is said to be a reply to it, from the superintendent of the asylum, is in the record, and is dated on November 18, 1895. This letter stated that Bullock had been in the asylum on four separate occasions; that he was first admitted on December 28, 1886; that his last admission occurred on September 26, 1895; and that excessive use of alcohol was the cause assigned by his family as producing insanity. On October 15, 1895, subsequently to the confidential statement, the insurance company notified Bullock that a quarterly premium on his policy would be due on November 13, 1895, and called on him to pay promptly to prevent his policy from lapsing. This premium was paid on November 13, 1895. The insurance company had further correspondence with the superintendent of the insane asylum, and on December 27, 1895, the insurance company wrote to Mrs. Eva M. Bullock, the wife of the insured, that it had incontrovertible evidence that her husband was then in the insane asylum, and had been confined there on four previous occasions, which information had been withheld by Bullock; that, in view of the facts, the company would be obliged to contest any claims, at any time, on account of the policy; that the company left it entirely to her own discretion to decide whether she would continue payments of premiums on account of the policy; that, if premiums should be accepted by the company, it would only be done under protest, and with the understanding that the company did not assume any liability, and that eventually the claim would be contested. The letter closed by offering Mrs. Bullock to return to her one-half of the $63.20 premium paid for the term commencing November 13, 1895, if she would relinquish her claim on account of the policy, and return it. On January 13, 1896, Mrs. Bullock wrote refusing the offer of the company. On

February 18, 1896, the premium due on that day was forwarded to the insurance company by A. A. Walker, who was general agent of the Penn Mutual Life Insurance Company, and who was appointed and authorized by the plaintiff in error to submit to it applications made to the Penn Mutual Life Insurance Company and rejected by that company. On March 4, 1896, the plaintiff in error returned to Walker the premium due February 13, 1896, and stated that it had canceled the policy on Bullock's life and declined to accept the premium for reasons stated in its letter to Mrs. Bullock of date December 27, 1895. In connection with the letter of March 4, 1896, just mentioned, the plaintiff in error, also on March 4, 1896, wrote to Mrs. Bullock that it had decided to decline acceptance of the premium; that the money had been returned to Walker; and that the policy had been canceled, as being null and void, for the reasons stated in its letter of December 27, 1895. On April 6, 1896, Mrs. Bullock replied, affirming the validity of the policy, refusing her consent to its rescission, and declaring her readiness and willingness to pay all premiums at maturity. Bullock having died on October 19, 1896, his widow, through her counsel, wrote to the insurance company asking for blanks to make the proof of death. On October 24, 1896, the insurance company replied that the policy had lapsed on February 13, 1896, because the premium had not been paid on that day, and that, in consequence of the nonpayment, Mrs. Bullock had no claim against the company.

If the insurance company, upon receiving the confidential statement on October 7, 1895, desired to cancel the policy, it was its duty to act with reasonable promptness; and if having been advised of facts of which it was previously ignorant and which in its opinion annulled the policy, or if having been put upon reasonable inquiry as to such facts, it continued to call upon Bullock for the premium, and received payment for it, the insurance company might be held to have waived the alleged concealment and to be estopped from contesting the policy. It was a question which, under the circumstances, was a proper one for the jury, and which, if decided by them against the plaintiff in error, would have defeated all of its defenses, even if these were well founded. It is therefore plain that the charges directing the verdict in favor of the plaintiff in error were correctly refused.

The plaintiff in error complains that the trial court instructed the jury as follows:

"But if you find from the evidence that the disorders from which Bullock suffered arose from sprees or excessive drink, or were the result of malarial fever, and that he was treated for other things than continued malarial fever within five years previous to the application for policy, and that these other things arose from sprees or excessive drink, then I charge you that such representation was not a breach of warranty of the policy."

Bullock, in his application for the policy, stated, in answer to the question whether he had always been temperate in the use of intoxicating liquors: "No. Previous to last year, was addicted to sprees." He was asked: "Have you had insanity, apoplexy, palsy, vertigo, convulsions, sunstroke, congestion, inflammation, or any other

disorder of the brain or nervous system?" He replied: "None, except hallucinations from drink." Again he was asked: "Have you had any illness or disease other than as stated above?" His reply was: "Yes; had typho-malarial or continued malarial fever in the fall of 1892." The further statement which by letter of date February 17, 1894, he made concerning his mental trouble, and his having been under treatment at the state hospital, has already been referred to.

We are of opinion that the charge just cited was erroneous. We cannot agree with the learned trial judge that, if Bullock had diseases which he did not disclose when asked concerning them, an avoidance of the policy can be prevented by showing that the diseases resulted from the "sprees" which Bullock admitted. It was material to the insurance company to know what diseases Bullock had had, regardless of the causes which might have superinduced the diseases. Whether one disease had resulted from, or been followed by, another, or was produced by accident or misconduct, it is plain that it was highly important to the insurance company to be informed that the applicant had had the disease, and it had the right to be so informed upon inquiry. We are clear that, because of this erroneous charge, the cause must be remanded.

There are other errors assigned. They are all secondary to the two questions we have dealt with, and are directed to matters which may not arise again when this cause is tried a second time. The judgment of the lower court is reversed, and this cause is remanded to that court, with the direction to award a new trial.